UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:

                                                 Case No.: 8-13-70361-dte

MIDDLE BAY GOLFERS'
ASSOCIATION, INC.,                               Chapter 7

                        Debtor.
---------------------------------------------------------x

# MEMORANDUM DECISION

*Appearances:*

Kenneth Kirschenbaum, Esq.
Chapter 7 Trustee

Kirschenbaum & Kirschenbaum
*Attorneys for the Chapter 7 Trustee*
By: Kenneth Kirschenbaum, Esq.
Michael A. Sabella, Esq.
200 Garden City Plaza
Suite 500
Garden City, New York 11530

Ellenoff Grossman & Schole, LLP
*Attorneys for Weinstein Enterprises, Inc.*
By: Howard J. Berman, Esq.
150 East 42nd Street
New York, New York 10017

Law Office of Michael G. McAuliffe
*Attorneys for South Bay Country Club, LLC*
By: Michael G. McAuliffe, Esq.
48 South Service Road
Suite 102
Melville, New York 11747

HONORABLE DOROTHY T, EISENBERG, UNITED STATES BANKRUPTCY JUDGE

Before the Court are two motions by the Chapter 7 Trustee both of which seek the entry of an order, *inter alia*, 1) terminating the interest of South Bay Country Club, LLC ("South Bay") in a certain assignment and assumption agreement pertaining to a lease of non-residential real property located at 3600 Skillman Avenue, Oceanside, New York (the "Premises"); 2) directing South Bay to turn over the keys and possession of the Premises and to vacate the Premises; and 3) authorizing the Trustee to take all necessary action to preserve the Premises, including making necessary repairs and improvements, and to operate the business of the Debtor until December 31, 2013. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and (b). This contested matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), and (O) and 11 U.S.C. §§ 105(a) and 721. The following constitutes the Court's finding of fact and conclusions of law as mandated by Bankruptcy Rule 7052.

DISCUSSION

The issues before the Court are 1) whether South Bay has defaulted on its monetary and non-monetary obligations under its contracts with the Trustee and Weinstein Enterprises, Inc. (the "Landlord"), such that grounds would exist for the Trustee's motions to terminate South Bay's interest in the lease, 2) whether South Bay's interest in the lease between the Debtor and the Landlord can be terminated without a 30-day written notice to cure the defaults, and 3) is the Trustee and/or Landlord entitled to liquidated damages, and if so, in what amount.

*I.     Background.*

For many years, the Debtor operated a country club and an 18-hole golf course at the Premises known as Middle Bay Country Club which faces the Waukena Waterway and Parsonage Creek on Long Island. The Premises consists of, among other things, a golf course,

2

driving range, a clubhouse that houses a catering facility and a pro shop, a halfway house that provided refreshments near the 9th hole, a starter's booth, a large swimming pool and smaller kiddie pool, 9 tennis courts and a tennis house, a security gate house, and various maintenance and storage buildings. The Debtor is a tenant of the Premises under a 50-year nonresidential triple net lease, dated August 24, 1967 (the "Lease") with the Landlord. As a result of Superstorm Sandy, which struck parts of the eastern seaboard in October of 2012, there was extensive saltwater damage and tree damage to the golf course and all the buildings and structures on the Premises. Under paragraph 7 of the Lease, the tenant is required to promptly repair or replace any property or buildings on the Premises if they are damaged or destroyed. The Debtor was so devastated from the damages arising from Superstorm Sandy that it was unable to make any repairs. As a result, the Debtor closed its operations and filed for chapter 7 relief on January 23, 2013.

Due to the bankruptcy filing, the Trustee took over the Debtor's interest in the Lease and the Premises as well as any remaining assets the Debtor may have. The Landlord initially filed a proof of claim against the bankruptcy estate asserting a general unsecured claim in the sum of $2,282,621.74 for unpaid rent, additional rent, and repairs, which was subsequently amended to reflect an amount owed of $5,056,220.71 (the "Landlord's Claim"). The amended claim included not only the anticipated cost to repair and restore the Premises, among other things, but also approximately $1,700,000 of machinery and equipment owned by the Landlord that was destroyed as a result of Superstorm Sandy. The machinery and equipment were required to be insured under the Landlord's name but were instead insured under the Debtor's name. Given the size of the Landlord's Claim, the Landlord is the estate's largest creditor.

3

II.    *Sale of the Lease.*

In hopes of finding a tenant who had the financial wherewithal to restore the Premises to a first class 18-hole championship golf course with a first-class country club and catering facility in a manner approved by the Landlord, and generating funds for the bankruptcy estate, the Trustee and the Landlord entered into an Extension and Modification Agreement, dated March 8, 2013, which extended the term of the Lease to December 31, 2026. In order to ensure that there would be sufficient funds to pay a distribution to the general unsecured creditors, the Trustee and the Landlord agreed that upon sale of the Lease most of the sale proceeds will go toward restoring the Premises and in exchange, the Landlord's Claim would be subordinated to the general unsecured creditors (the "Subordinated Claim"); otherwise, the size of the Landlord's Claim would leave little to no distribution to general unsecured creditors.

To ensure that any restoration of the Premises would proceed smoothly in a professional and organized manner, the Extension and Modification Agreement amended the Lease to require that any alterations, additions or improvements, including repair and restoration of the Premises as a result of damage by any casualty, 1) be completed in a good, workmanlike manner; 2) comply with all applicable governmental requirements; 3) be performed under the supervision of a licensed architect approved by the landlord, which consent shall not be unreasonably withheld; 4) have approvals from all applicable governmental authorities for all work done; and 5) prior to commencement, the Landlord was to be furnished with evidence of insurance that is in full force during the course of such work. The insurance must cover all real and personal property on the Premises, commercial general liability and excess general liability, casualty, workers' compensation, employees' disability, and business interruption insurance, which would include

4

rent insurance, and the policies must name the Landlord as an insured party. The Landlord was authorized to periodically inspect the work being done to the Premises with a view toward the avoidance or prevention of potential breaches of the Lease but the Landlord would not be responsible for the completion of the work or the quality of the workmanship.

On March 12, 2013, a public auction sale was conducted to sell the Lease, as amended, on an "as is, where as" basis. Tariq Kahn, a former member of the Debtor's country club, was ultimately the successful bidder with the purchase price of $2,600,000. He assigned his right to purchase the Lease to South Bay, a newly formed entity organized for the purpose of acquiring the Lease and operating the golf course and country club.

On April 8, 2013, South Bay, the Landlord and the Trustee entered into an Assignment and Assumption Agreement (the "A&A Agreement"), pursuant to which the Trustee would assume the Lease and satisfy its prepetition and postpetition monetary defaults under the Lease. Upon South Bay's payment of $2,600,000 on or before April 19, 2013 (the "Delivery Date"), with time being of the essence, the Trustee would assign its rights in the Lease and deliver possession of the Premises to South Bay. South Bay placed a $1,000,000 deposit with the Trustee to be retained as liquidated damages should South Bay default in paying the balance of the consideration. Of the purchase price, $600,000 was to go to the estate and the remaining $2 million was to go to the Landlord, and in exchange, the Landlord formally agreed to subordinate the Landlord's Claim against the estate. The $2 million held by the Landlord was for the benefit of South Bay to be used in connection with the repair and restoration of the Premises (the "Work Fund"). If the amount of the Work Fund exceeded the entire cost of South Bay's work, then such excess would be disbursed back to South Bay. However, if the actual cost of the restoration

5

incurred by South Bay between the Delivery Date and December 31, 2013 exceeds the $2,000,000 (excluding the cost of golf course equipment), then the Landlord agrees to pay South Bay one half of any sums received by the Landlord on account of the Landlord's Subordinated Claim. Thus, the Landlord would not receive any direct monetary benefit from the sale of the Lease other than a new tenant who would make the necessary repairs and restoration to the Premises and assume all the tenant's obligations under the Lease. This was the intent and goal of all the parties and the reason for the Landlord's willingness to allow the Trustee to sell the Lease and to subordinate its claim against the bankruptcy estate.

To ensure that the repair and restoration work was done with appropriate care and consideration so there would be no issues of liability to the Landlord or with respect to the Premises and the Work Fund would not be depleted or mis-used, the Parties agreed to certain strict guidelines to be followed in order to obtain a release of funds from the Work Fund. In addition to the requirements under the amended Lease, South Bay was required to: a) provide a certificate signed by South Bay and the architect or engineer in charge of the work, reasonably satisfactory to Landlord setting forth (i) that the sum requested from the Work Fund has either been paid by South Bay or is due to the contractors or other persons who have rendered services or furnished materials; (ii) a detailed description of the services and materials rendered; (iii) that there is no outstanding indebtedness actually known; and (iv) that the work has been completed in accordance with the plans and specifications, and b) provide lien waivers, title insurance company reports or such other evidence reasonably satisfactory to the Landlord.

On April 16, 2013, the Court approved the A&A Agreement as agreed upon by the parties. Upon full payment of the purchase price, South Bay would become the assignee of the

Trustee's interest in the Premises and succeed the Trustee as the tenant of the Landlord under the long term Lease.

South Bay was unable to pay the full consideration as required by the April 19 Delivery Date and requested an extension of time to pay. On April 19, the parties entered into an Agreement Extending Delivery Date (the "First Extension"), which provided that South Bay was to pay $1,100,000 upon execution of the First Extension, and $150,000 no later than April 26, 2013 at 11:00 a.m. The Delivery Date for the Lease and the deadline to pay the remaining $350,000 balance was extended to June 20, 2013 at 11:00 a.m., with time being of the essence, and conditioned upon South Bay being in compliance with the terms of the Lease and the A&A Agreement. South Bay was also required to pay certain adjustments for rents and real estate taxes and assumed all risk for condemnation and casualty to the Premises, including all municipal violations, fines and costs to cure as of April 19. The Trustee would continue the insurance policies covering the Premises up to the extended Delivery Date.

Because South Bay was eager to commence clean-up and conduct its golf business as soon as possible, it requested permission to enter the Premises and a release of the monies from the Work Fund even though it did not pay the purchase price in full. Under the First Extension, the Trustee, with the Landlord's approval, granted South Bay a license to access the Premises as early as April 19 in order to clean up, maintain and restore the golf course and the structures in accordance with the requirements set forth in the Lease and A&A Agreement and to remedy some of the violations the Town of Hempstead (the "Town") had issued with respect to the condition of the Premises. At the Trustee's request, the Landlord agreed to advance $300,000 from the Work Fund for such purpose. Under the same license, South Bay was allowed to

7

commence promotion of its business but not its golf business operations until it had complied

with all insurance requirements and paid all the amounts due to the Trustee. The First Extension

was approved by the Court on April 29, 2013.

By the June 20 Delivery Date, South Bay had paid $2,250,000 of the purchase price but

was unable to make the final payment of $350,000 and again requested a further extension. On

June 20, 2013, the parties entered into the Second Extension Agreement. Under the Second

Extension Agreement, South Bay was required to pay $138,358.60 for rent and real estate tax

adjustments and reimbursements for premiums made under the Debtor's insurance policies no

later than July 1, 2013 and the Delivery Date for the $350,000 payment was extended to July 9,

2013 at 11:00 a.m., with time being of the essence. The Second Extension Agreement was

conditioned upon South Bay complying with the requirements under the Lease, the A&A

Agreement, the First Extension and Second Extension Agreement (collectively, the

"Agreements").

As part of the Second Extension Agreement, the Landlord specifically required South

Bay to, among other things, (1) comply with all requirements for seeking funds from the Work

Fund, including, but not limited to, certificates signed by South Bay and a licensed New York

state architect or engineer approved by Landlord, and (2) no later than July 2, 2013, provide the

Landlord with a reconciliation of the disbursement of the $300,000 previously advanced from

the Work Fund. The reconciliation shall be certified by South Bay and its licensed New York

state architect or engineer and evidenced by canceled checks or itemized bank statements or

credit card statements and corresponding invoices or contracts describing the work performed

and the name of the contractor.[1] South Bay was not permitted to allow any workers or contractors on the Premises unless they provide evidence of general liability, property damage and workmen's compensation insurance, naming the Trustee and Landlord as additional insureds. South Bay acknowledged that should it fail to complete the payments or default on any provision of the Agreements, the Trustee shall retain the entire amount of the deposit paid by South Bay as liquidated damages and South Bay shall have no further access to the Premises, the deposit, the Work Fund or the Lease.[2]

On July 1, 2013, Mr. Kahn appeared at the Trustee's offices without the required payment of $138,358.60 for the rent, real estate taxes and the insurance payments due. The Trustee extended the July 1 deadline for these payments, without Landlord's consent, to no later than noon, July 2, 2013. South Bay did not make the $138,358.60 payment by the July 2 deadline nor did it pay the balance of the $350,000 purchase price by the July 9 deadline as set forth under the Second Extension Agreement.

III.    *Trustee's Motion to Terminate South Bay's License and Interest in the Lease.*

On July 3, 2013, the Trustee filed his first motion requesting the Court to: 1) terminate the Agreements with South Bay due to South Bay's defaults; 2) direct South Bay to vacate the Premises and turn over possession of the Premises to the Trustee; 3) direct the United States Marshals Service to assist in the removal of South Bay, if necessary; 4) direct South Bay not to remove any equipment, inventory, machinery, tool, supplies and material as set forth under the Agreements; and 5) permit the Trustee to operate the Debtor's business for the remainder of the

---

[1] Second Extension Agreement, para. 3.

[2] Second Extension Agreement, para. 5.

calendar year pursuant to 11 U.S.C. § 721 (the "Termination Motion"). While it was South Bay that defaulted under the Agreements, the Trustee, as named tenant under the Lease, in principle was in turn in default under the Lease and its agreement with the Landlord.

The Court conducted evidentiary hearings on July 11, August 6, August 15, August 26, August 27 and September 23, 2013, to determine whether South Bay failed to comply with the monetary and non-monetary obligations under the Agreements, and whether the alleged defaults constitute a material breach of the Agreements, such that South Bay's license and interest in the Lease and should be terminated. Pending the conclusion of the evidentiary hearings and the decision of this Court, South Bay continued to allow workers, members and guests onto the Premises and continued to undertake repair and construction work up until August 6, when the Court directed that no further construction work be done at the Premises other than work necessary to maintain the golf course. However, South Bay was permitted to continue to operate the golf course and allow members and guests to use the golf course under the Trustee's supervision.

IV.    *Subsequent Issues and the Emergency Motion.*

While the evidentiary hearings were taking place, a sewer pipe ruptured under the clubhouse which necessitated emergency repairs with monies from the Work Fund. While South Bay had initially notified the Landlord that there were plumbing issues, it failed to inform the Landlord for about 10 days as to the severity of the plumbing issues, what work was required and who South Bay was hiring to address the problems. Only after the Landlord and the Trustee got involved did the parties agree to have the Trustee hire the appropriate professional to have the plumbing fixed.

On October 31, 2013, the Trustee brought an emergency motion seeking an order directing South Bay to vacate the Premises immediately and authorizing the Trustee to take any necessary actions to remove certain violations of local fire prevention ordinances (the "Emergency Motion"). On October 4, 2013, the Nassau County Fire Commission, Office of Fire Marshal, had inspected the clubhouse, which houses the pro shop, South Bay's offices and restrooms, and found that one of the five automatic sprinkler systems was not operational and the dry system air compressor was running continuously when it should not have been. It is believed that there was no electricity to the systems that would be necessary to alert the alarm company and the fire department in case of a fire. The fire marshal issued a violation order (the "Violation Order") directing there be no occupancy on the Premises until the sprinkler system is fully operational. A failure to comply with the ordinances would result in a misdemeanor punishable by either a fine or imprisonment, and for every 15 days the prohibited condition is maintained, it shall constitute a separate offense. Art. XVIII of the Nassau County Fire Prevent Ordinance.

After receiving the Violation Order, South Bay contacted Fire Command Co., Inc., the company that installed and serviced the sprinkler system at the Premises. South Bay represented that Fire Command refused to work on the sprinkler system until an $11,000 mechanic's lien filed against the Debtor pre-Superstorm Sandy was satisfied and only consented to perform the work after South Bay agreed to pay Fire Command up-front. It took more than a week for Fire Command to test all the sprinkler systems to determine which system was not operational.

Notwithstanding the pending no occupancy directive, South Bay continued to permit workers, members and guest regular access to the clubhouse and the facilities. It is unknown whether South Bay maintains causality insurance for fire damage, whether the amount of

11

coverage is sufficient, and whether any policy would have been in effect if the sprinkler system was non-operational. Moreover, South Bay failed to inform either the Trustee or the Landlord of the Violation Order. The Trustee did not learn of the violation until October 29, 2013 when the Landlord visited the Premises. On November 1, 2013, the Trustee and the Landlord's counsel met with Mr. Kahn and South Bay's general manager to go over the violations. On the same day, Fire Command and an electrician remedied the issues with the fire sprinkler system.

The Trustee expressed concern that South Bay's failure to inform the Trustee and the Landlord about the violation and its continued operation of the golf course while the Violation Order was outstanding, exposed them to a potential liability should anything have happened while workers, members and guests were on the Premises. Pending the determination of the Court on the Trustee's Termination Motion and Emergency Motion, the Court in the interim authorized the Trustee to take any action, subject to the Landlord's express consent, to preserve, repair and restore the Premises should any further problems arise, with notice to South Bay's counsel.

V.      *Cause of Action for Breach of Contract.*

Under the Termination Motion, the Trustee argues that South Bay breached the Agreements as a result of various defaults. An action for breach of a contract in New York requires proof of 1) a contract; 2) performance of the contract by one party; 3) breach by the other party; and 4) damages. *Bear Stearns Funding, Inc. v. Interface Group – Nevada, Inc.*, 361 F. Supp. 2d 283, 290 (2005). "A party may unilaterally terminate a contract where the other party has breached and the breach is material. A material breach is one that has been defined as one that would justify the other party to suspend his own performance of the contract." *Lanvin*

*Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 195 (S.D.N.Y. 1990) (internal citations omitted). Whether a breach is material is a factual issue. *In re Helm*, 335 B.R. 528, 535 (Bankr. S.D.N.Y. 2006). The breach must be so substantial that it defeats the object of the parties in making the contract such that the non-breaching party's obligation under the contract is discharged. *Bear Stearns Funding, Inc.*, 361 F. Supp. 2d at 295; *In re Helm*, 335 B.R. at 535 (a breach is material if it "goes to the root of the agreement between the parties, and is so substantial that it defeats that object of the parties in making the contract.")(citing *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004)).

> A.      *Monetary Defaults.*

When there is a declaration in a real estate contract that time is of the essence, the parties must tender performance by the required day unless the time for performance is extended by mutual agreement. *Grace v. Nappa*, 46 N.Y.2d 560, 565 (N.Y. 1979). Here, the Delivery Date was originally April 19, 2013 with time being of the essence. The parties mutually agreed to extend the Delivery Date to June 20, and then to July 1 on the condition that South Bay timely make certain payments and abide by the conditions set forth in the Agreements. Thus, when South Bay failed to make the required payments for rent and tax adjustments, insurance premiums, and the balance of the purchase price by the deadlines imposed by the time is of the essence provisions under the Agreements and the Trustee and the Landlord did not agree to further extend the time for performance, South Bay was in default of its monetary obligations. While South Bay tendered the $138,358.60 payment for the adjustments on July 11 and offered to pay the balance of the purchase price on August 5, 2013 if the Trustee and the Landlord waive all the defaults, the Trustee and the Landlord need not accept such late performance when the

Agreements required timely performance of South Bay's payment obligations.

        B.      *Non-Monetary Defaults.*

        Although South Bay argues that the monetary defaults are not fatal because the delay in payment is not prejudicial, the Trustee and the Landlord are concerned that South Bay's repeated disregard of the non-monetary obligations they had negotiated under the Agreements will persist even if the current defaults are cured or waived, resulting in others being continuously exposed to the risk of injury, and exposed to potential liability.

        1.      *Failure to Provide a Reconciliation of Monies Advanced from the Work Fund.*

        One of South Bay's numerous non-monetary defaults cited by the Landlord is the failure to provide any reconciliation or accounting of the $300,000 advanced from the Work Fund. The requirement that South Bay not deplete or mis-use the Work Fund was so important that the Landlord specifically conditioned the second extension of the Delivery Date upon South Bay providing a reconciliation certified by South Bay and a licensed New York state architect or engineer that itemizes the work performed and the name of the contractor. South Bay failed to provide the required reconciliation by the July 2 deadline. Only after the Termination Motion was brought, did South Bay provide a document, dated July 9, 2013 purporting to be a reconciliation certified by an accountant and not a licensed architect or engineer. The purported reconciliation was simply a compilation of 5 pages of schedules of expenses provided by South Bay with a cover letter by the accountant stating that he did not audit or review the schedule of expenses. The compilation did not contain any supporting documentation such as invoices, cancelled checks, or contracts describing the work performed by the contractors.

        Subsequently, South Bay retained the services of a project manager, RVA Management

LLC, to go through the Premises, review documents, such as invoices and proposals, compare them to work done, and produce a reconciliation of what monies had been spent to date. Such reconciliation has not yet been produced. Scott Baird, the principal of RVA, is not a licensed engineer or architect and has no experience as a construction manager in respect to a golf course or country club. RVA was not at the Premises on a daily basis to monitor what work was being done and what materials were used, and whether it was done appropriately so that it can determine whether a contractor would be entitled to payment. Mr. Baird does not have any expertise regarding the applicable building codes and could not tell from looking at the architectural plan and the work completed for the halfway house whether the work conformed to the applicable building code.

In the absence of a meaningful reconciliation, the Landlord could not verify whether the $300,000 advanced from the Work Fund was appropriately spent on the clean-up and restoration of the Premises. South Bay's inability to obtain and maintain proper records of the funds spent and to provide the required reconciliation constitutes a breach of a material provision under the Agreements.

>    2.    *Failure to Submit a Master Plan for the Restoration and Hire a Qualified Professional to Oversee the Restoration.*

The Landlord and the Trustee repeatedly communicated to Mr. Kahn that under the Agreements, South Bay must submit a master plan prepared by a licensed architect for the Landlord's review and consent prior to commencing any restoration work. Mr. Kahn is not a licensed architect or engineer and did not have the personal experience to undertake a major restoration of the magnitude necessary for the Premises. The Landlord wanted an overall master plan drafted by a licensed professional to determine precisely what was being done at the

15

Premises and how all the changes would fit together and did not want piecemeal restoration to take place which may result in the need for corrections and waste of the Work Fund. Nevertheless, South Bay commenced and continued to work on the Premises on an *ad hoc* and piecemeal basis, including making substantial alterations, without ever submitting any plan for the Landlord's review or consent nor did it have a licensed architect or engineer supervise the work. South Bay had the cement pad at the driving range expanded and rotated to face a different direction and had a fence installed around it, thus making it a permanent modification. South Bay also built a new starter's booth and restored the pro shop, and enlarged a structure that houses equipment that collects driving range golf balls. It also had certain walls separating two card rooms inside the clubhouse demolished with the intention of creating one large party room. South Bay didn't obtain any permits for the work done and there is no information as to whether these new structures and alterations comply with the applicable building codes.

When the Termination Motion was filed, there was no project manager, licensed architect or engineer overseeing any of the work done. One of the three architects retained by South Bay, Parish Merriweather, is not a licensed architect in New York. Robert Haussmann, R.A., who is a licensed architect, was retained in or around June 10, 2013 to do repair work relating to the clubhouse and an existing patio; review current documentation, including existing floor plans; submit completed architectural drawings to the Town for review and approval; oversee the progress of the project; and potentially close off the swimming pool. Mr. Haussmann's services did not include, *inter alia*, plumbing sign-off, electric sign-off, survey, or construction supervision. Mr. Haussmann did not do any immediate work due to personal medical issues until his second visit to the Premises on August 14, more than a month after the Trustee brought this

Termination Motion. Mr. Haussmann never spoke with, nor submitted any proposal to, the Landlord regarding any of the work to be done prior to testifying at the hearing on the Trustee's Termination Motion. By the time Mr. Haussmann was ready to commence working, South Bay already had the pro shop, the starter's booth and the driving range completed.

South Bay also retained Miguel Weinstein, a licensed architect, with respect to the halfway house which had been reduced to its cement foundation as a result of Superstorm Sandy. Mr. Weinstein drafted the only restoration plan South Bay had prior to the filing of the Termination Motion. However, Mr. Weinstein's role was limited to drawing the architectural plan and applying for a building permit. The building permit application submitted to the Town stated that the proposed work was an alteration when in fact it was proposing to construct a new halfway house on the existing cement foundation. Furthermore, the Landlord's signature was required on the application as the owner, but South Bay did not notify the Landlord about the building permit application, the architectural drawing or proposed work to be done to the halfway house. Rather, South Bay signed the application as the owner to obtain the requisite permit. A copy of the architectural drawing was then taped to a window at the halfway house and South Bay had the frame of the halfway house built and the exterior completed before the Landlord was aware of what was done.

Moreover, Mr. Weinstein did not supervise the construction of the halfway house nor did South Bay hire a licensed architect or engineer to do so. As a result, not all the work done on the halfway house complies with the required building code. Ira Shapiro, the Landlord's licensed architect, testified that the exterior walls and siding of the halfway house do not withstand 110 miles per hour winds as required under the building codes because there is no substantial beam

or structural component to brace the exterior walls beneath the windows, nor is there any information whether the installed windows meet the same wind tolerance requirement. In addition, the electrical and plumbing work had already been covered by sheet rock so neither Mr. Haussmann nor Mr. Shapiro would be able to inspect the electrical and plumbing work unless the sheetrock is removed.

South Bay had an unauthorized outside deck built at the halfway house that did not previously exist. Because the deck was not included in Mr. Weinstein's architectural drawing submitted to the Town, there is no building permit for the deck. South Bay did not inform the Landlord about the deck and there is no information as to whether the deck meets the required load (i.e., weight) or lift specifications for safety purposes and a portion of the deck would need to be removed in order for an adequate inspection to occur. In fact, the ramp to the deck and the outside access to the restrooms from the deck are not in compliance with the Americans with Disabilities Act ("ADA") and would need to be redone and a building permit obtained if a deck were to remain.

As the record reflects, South Bay's failure 1) to have a licensed architect or engineer, who is knowledgeable about construction and the required building codes, draft a master plan and submit such plan to the Landlord prior to commencing work on the Premises, and 2) to have a licensed architect or engineer supervise the restoration of the Premises, constitutes a breach of the Agreements.

> 3. *Failure to Comply with Insurance Obligations under the Agreements.*

South Bay only has a license to clean up and renovate the Premises and to promote its business. It was not allowed to have golf members play on the golf course until it satisfied all the

insurance requirements under the Agreements and paid the balance of the purchase price. It is clear that South Bay did not have any insurance policy in effect at the time the Trustee filed the Termination Motion in July even though South Bay had workers on the Premises as early as April 19 and opened the golf course to members and their guests for play since May. South Bay failed to provide any of the required proof that South Bay or any of its contractors carried insurance for general liability, disability and workers' compensation and that the Trustee and the Landlord were covered as additional insureds. The Trustee went as far as preparing a rider requiring each contractor to provide proof of insurance and to indemnify the Landlord and the Trustee. Yet, none of these riders were signed by the contractors prior to the Termination Motion. Of the proof of insurance that was provided by various contractors, only South Bay is listed as an additional insured and not the Trustee nor the Landlord.

With respect to South Bay's own insurance, South Bay asserts that it relied upon the Debtor's insurance policies being assignable to it rather than obtaining its own insurance. However, South Bay did not ascertain whether those insurance policies were indeed assignable prior to allowing workers, members and guests on the Premises. It was only after the Termination Motion was filed that South Bay obtained Certificates of Liability Insurance that were to be effective retroactively. The Certificates of Liability Insurance were issued for information only and as of the August 6 hearing on the Termination Motion, an insurance underwriter had not yet visited the Premises and there was no underlying insurance policy issued at the time. The Court, the Landlord and the Trustee have yet to receive a copy of the underlying insurance policies. Certificates of insurance which are issued as a matter for information only are insufficient to establish that the requisite insurance was maintained. *JT Queens Carwash, Inc. v.*

*88-16 Northern Blvd., LLC*, 101 A.D.3d 1089, 1090, 956 N.Y.S.2d 536, 537 (N.Y. App. Div. 2012). The failure to provide the landlord with proof of the specified insurance coverage can be found to be a material breach of the lease and a basis for termination. *C & N Camera & Electronics, Inc. v. Farmore Realty, Inc.*, 178 A.D.2d 310, 577 N.Y.S.2d 613, 614 (N.Y. App. Div. 1991).

To the extent South Bay has insurance for workers' compensation, there is no evidence that the Trustee or the Landlord is listed as an additional insured under the policy. Furthermore, based upon the Certificate of Liability Insurance, dated July 9, 2013, workers' compensation would only cover employees on payroll on July 3 and thereafter. The Trustee observed 15 to 20 people working at the Premises in terms of cleaning-up, maintaining the golf course, and operating the pro shop and golf cart area, but South Bay's payroll record for week ending on July 12, 2013 lists only two employees, and the payroll record for the week ending on July 19, 2013 lists only seven employees. Most of the people were paid in cash and thus, were not covered by workers' compensation. Accordingly, neither the Trustee nor the Landlord was protected from liability given South Bay's failure to ensure that it had appropriate insurance coverage in place prior to allowing access to the Premises. South Bay's failure to comply with its obligations under the Agreements constitutes a material breach.

C.    *Forfeiture of South Bay's License and Interest in the Lease.*

Although South Bay did not present evidence to overcome the Trustee's claims that South Bay failed to pay the purchase price timely, and violated the non-monetary requirements under the Agreements, it argued that it would be prejudiced if the Trustee's Termination Motion and Emergency Motion were to be granted and South Bay were to forfeit its interest in the Lease

since it has already paid most of the purchase price and has expended in excess of $670,000 in restoration expenses but only received $300,000 from the Work Fund.

This is not an instance where the Trustee's decision to terminate is based upon a good faith mistake on the part of South Bay and would result in an inequitable forfeiture of South Bay's license and interest in the Lease. South Bay's repeated failure to comply with its obligations under the Agreements is substantial and cannot be easily cured without a cost to the bankruptcy estate. South Bay has already made material alterations to certain structures of the Premises, such as the halfway house with its unauthorized deck, the starter's booth, the driving range and the equipment storage buildings. Some of the work done must be corrected and appropriate permits need to be obtained which will reduce the funds available in the Work Fund for the restoration needed for the rest of the Premises.

South Bay argues that the alterations improved the Premises after the devastation wrought by Superstorm Sandy. The golf course has been restored to the point that it has been operating and members and their guests have been playing on the golf course. The pro shop is operating and completely refinished with the offices being occupied. The starter's booth and the equipment shed have been rebuilt. The halfway house was in the process of being finished before the Court directed restoration work to cease.

However, "the issue of waste turns not on whether the alteration renders the premises more valuable, but on whether it impinges upon the landlord's right to receive the premises in substantially the same form and character as when the tenant took possession." *In re Allen Carpet Shops, Inc.*, 25 B.R. 595, 600 (Bankr. E.D.N.Y. 1982). See also, *Kaminoff et al. v. Speigel et al.,* 93 Misc. 2d 458, 460, 402 N.Y.S.2d 777, 778 (N.Y. Civ. Ct. 1978) (finding that a

substantial violation of the lease occurred not because the tenant installed an air conditioner *per se* but the manner in which it was installed and what was done to the property). There is an expectation that the Premises would be returned to the Landlord in similar form and character subject to any wear and tear over the years and changes or renovations approved by the Landlord. Indeed, the Lease requires the tenant to repair or replace any property or building if they are damaged or destroyed. South Bay does not have the unfettered right to unilaterally decide to restore the Premises in the manner and design it chooses, without notifying the Landlord and obtaining its consent. South Bay's actions potentially change the form and character of the Premises because these are permanent alterations on a large scale that affect various parts of the Premises which have not been submitted to the Landlord for consideration.

The fact that South Bay is now willing to hire the Landlord's own architect and comply with its obligations under the Agreements is too little, too late. "Moreover, the promise to restore the premises to their original condition *in futuro* is no defense to an action for waste." *In re Allen Carpet Shops, Inc*., 25 B.R. at 601 (citing *Agate v. Lowenbein*, 57 N.Y. at 614). While the Landlord's requirement that the guidelines for restoration process and disbursement of funds be strictly adhered to may make the cost of restoration more expensive and time consuming, South Bay agreed to such restrictions. It became clear to the Landlord, the Trustee, and then to this Court during the evidentiary hearings, that South Bay wanted to proceed with the restoration in a manner that it believes is appropriate without having to report to anyone else. Based upon its past conduct, South Bay has not shown that it is capable of adhering to its obligations under the Agreements in the future. Accordingly, forfeiture of South Bay's license and its interest in the Lease is warranted.

VI.     *Whether South Bay is Entitled to a 30 -Day Notice to Cure.*

South Bay contends that the Trustee and the Landlord cannot terminate its license and interest in the Lease because neither South Bay nor the Trustee received a 30-day written notice from the Landlord to cure the defaults as required under the Lease. Arguably, until such 30-day notice is received, the Trustee's motions would be pre-mature and South Bay should have the opportunity to cure such defaults.

While South Bay is a party under the Agreements and is required to comply with the obligations under the Lease as if it were a tenant, South Bay currently holds only a license with respect to the Premises. Under New York law, a license gives one party the authority to enter the land of another to do a particular act or series of acts without possessing any interest in the land, and a licensee occupies the land so far as is necessary to do the act with no further right of possession. *In re Yachthaven Restaurant, Inc.*, 103 B.R. 68, 72-73 (Bankr. E.D.N.Y. 1989). Whereas, a lease gives actual control and exclusive possession of the land to the tenant for all purposes not prohibited or reserved by the lease. *Id.*; *American Jewish Theatre, Inc. v. Roundabout Theatre Co., Inc.*, 203 A.D.2d 155, 156 (N.Y. App. Div. 1994). "The common law rule is that a license in real property is revocable at the will of the licensor unless it is coupled with an interest or made irrevocable by the terms of the contract." *In re Yachthaven Restaurant, Inc.*, 103 B.R. at 73. A license is coupled with an interest where the license is given pursuant to a contract for a definitive term on valuable consideration. *Id.* Even though a license coupled with an interest is not revocable at will, the parties to a license may freely agree that the license be revocable at any time after notice has been given. *Id.*

As set forth in paragraph 7 of the First Extension, South Bay was only given a license by

the Trustee to have access to the Premises "in connection with the clean-up, maintenance and restoration of the golf course and structures on the premises . . . all in accordance with the requirements set forth in the Lease and A&A Agreement." This was to allow South Bay to get a head start on the clean-up process while it was still securing the necessary funds to pay the outstanding balance of the purchase price in order to succeed the Trustee as tenant under the Lease. While South Bay was also required to pay for all adjustments as of April 19 so that the Trustee would not be prejudiced by the granting of the extensions, under the A&A Agreement South Bay would become a tenant under the Lease only upon payment of the purchase price in full and the Lease assigned and delivered to it. Until then, South Bay was not entitled to any benefits or rights that would arise as a tenant under the Lease, nor did it obtain possession and control over the Premises.

Because South Bay does not have a tenant-landlord relationship with the Landlord or the Trustee, neither Weinstein nor the Trustee is obligated to give South Bay any 30-day notice to cure. The licensor-licensee relationship between the Trustee and South Bay is independent from the landlord-tenant relationship between Weinstein and the Trustee. Accordingly, the fact that the Landlord did not give the Trustee or South Bay a 30-day notice to cure is irrelevant as to whether the Trustee can terminate South Bay's license due to South Bay's defaults. Moreover, the parties agreed that the license may be canceled and terminated at any time and without notice by the Trustee,[3] in his sole discretion, if he reasonably believes that South Bay is not adequately

---

[3] Notwithstanding the agreement among the parties that the license may be terminated without notice, NEW YORK REAL PROPERTY ACTIONS AND PROCEEDINGS LAW ("N.Y. R.P.A.P.L.") § 713(7) requires that a licensee be given 10 days notice if one were to commence a special proceeding to compel the licensee to quit the premises where the license has been revoked by the licensor. N.Y. R.P.A.P.L. § 713(7)(McKinney's 2013). The Trustee notified South Bay that the license was to be terminated on July 2, 2013 but such termination would not be effective until the requisite notice has been given. Pending the Court's determination of whether the license should be

preserving and protecting the Premises, including but not limited to failing to perform all the tenant obligations required under the Lease and the A&A Agreement.[4]

In this case, the Trustee exercised his business judgment in determining that South Bay's license and interest in the Lease should be terminated. Under the business judgment rule, "the trustee is given a substantial degree of discretion in deciding how best to administer the estate committed to his care," and so long as the trustee's action falls within the proper scope of his business judgment, his decision will be upheld. *In re Consolidated Indus. Corp.*, 330 B.R. 712, 715 (Bankr. N.D. Ind. 2005). See also, *In re Taub*, 441 B.R. 211, 216 (Bankr. E.D.N.Y. 2010); *In re Castre, Inc.*, 312 B.R. 426, 430-31 (Bankr. D. Colo. 2004). In carrying out their business judgment, "the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor." *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 43 (2d Cir. 1979). This may involve a balancing of interests of not only the general unsecured creditors but other parties where the damage to them may be disproportionate to the benefit derived by the estate. *Id.*; *Sundial Asphalt Co., Inc. v. V.P.C. Investors Corp. (In re Sundial Asphalt Co., Inc.)*, 147 B.R. 72, 82 (E.D.N.Y. 1992); *Robertson v. Pierce (In re Chi-Feng Huang)*, 23 B.R. 798, 801 (9th Cir. B.A.P. 1982). See also, *In re Ginsburg Mfg. Co.*, No. 80 B 11700, 1981 Bankr. LEXIS 3410, *2 (Bankr. S.D.N.Y. July 9, 1981) (declining to override a chapter 11 trustee's business judgment to terminate the employment contracts of insiders and eventually the debtors' operations as being in the best

---

terminated, South Bay was permitted to retain access to the Premises to continue to repair and restoration work until August 6, 2013 at which point South Bay's access was limited to operation of the golf course. Accordingly, the 10-day notice requirement under N.Y. R.P.A.P.L. § 713(7) has been more than adequately satisfied and no further notice of termination need be given.

[4] First Extension, para. 7; Second Extension Agreement, para. 10.

interest of creditors where the trustee's decision was made after a review of the businesses' prospective orders and projections and there was no evidence that the trustee's decision was clearly erroneous).

The Trustee, supported by the Landlord, argues that his decision to terminate South Bay's license and interest in the Lease is an appropriate exercise of his business judgment because South Bay's breach of the Agreements is materially sufficient to place the Trustee's agreement with the Landlord in jeopardy of being declared in default. Aside from the potential liability arising from South Bay's failure to have adequate insurance coverage, the Trustee is still the named tenant under the Lease and remains responsible for the maintenance and repair of the Premises. As a result of South Bay's breach, the Trustee needs to incur the cost of repairing and restoring the Premises and the general unsecured creditors may receive little or no distribution. Based upon the foregoing, the Trustee was well within his rights to exercise his business judgment to terminate the license and to not deliver the Lease to South Bay.

VII.    *Whether Liquidated Damages Are Appropriate.*

With respect to the amount of damages the Trustee and/or the Landlord is entitled to as a result of South Bay's breach, there are issues as to the right to the sums expended by each of the parties and the rights negotiated per the Agreements. The Court recognizes that the Trustee and the Landlord have suffered damages and that South Bay has deposited certain funds with the Trustee and has incurred financial liability for some alleged beneficial improvements to the Premises in excess of the $300,000 advanced from the Work Fund. The Court will conduct a separate hearing to determine the liquidated damages claim and what, if anything, would be due to each of the parties to the Agreements.

<u>CONCLUSION</u>

Based upon the foregoing and a finding by this Court that South Bay materially breached its contracts with the Trustee and the Landlord by defaulting on its monetary and non-monetary obligations, the Trustee's Termination Motion and Emergency Motion are granted. The Trustee is authorized to terminate South Bay's license, and the Trustee need not deliver the Lease to South Bay. South Bay is directed to vacate the Premises within 14 days of the entry of this Order. A separate evidentiary hearing on the issue of damages shall be held on January 13, 2014 at 10:00 a.m.

An order will be entered separately.

**Dated: Central Islip, New York**
**December 5, 2013**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**